JUDITH WEST, Special Adm'r of the Estate of Daymond West, Jr., Deceased, Plaintiff-Appellant, v. GRANNY'S ROCKER NITECLUB, INC., *et al.*, Defendants-Appellees.

Fifth District    No. 5—93—0375

Opinion filed December 1, 1994.

David Hesi, of Wiseman, Shaikewitz, McGivern, Wahl, Flavin, Hesi, Barylske & Mormino, P.C., of Alton, for appellant.

Theodore J. Williams, Jr., and Andrew B. Mayfield, both of Armstrong, Teasdale, Schlafly & Davis, of St. Louis, Missouri, for appellees Granny's Rocker Niteclub, Inc., and Larry R. Rolens.

Theodore J. MacDonald and Shari M. Brunton, both of Burroughs, Hepler, Broom, MacDonald & Hebrank, of Edwardsville, for appellee Fred D. Dublo, Sr.

Kevin F. Blaine and Madelyn J. Lamb, both of Coppinger, Carter, Schrempf & Blaine, Ltd., of Alton, for appellee City of Alton.

PRESIDING JUSTICE LEWIS delivered the opinion of the court: Judith West, as the special administrator of the estate of Daymond West, deceased, brought this wrongful death suit against defendants, Granny's Rocker Niteclub, Inc., Larry R. Rolens, who owns Granny's (both referred to collectively as Granny's), Fred D. Dublo, Sr., doing business as Fred's Towing (Fred's), and the City of Alton, Illinois (the city), after Daymond was killed in a motorcycle accident. The trial court dismissed the complaint as to Granny's and entered summary judgment against plaintiff and in favor of Fred's and the city. Plaintiff appeals, raising three issues: (1) whether the complaint states a cause of action for willful and wanton misconduct by Granny's; (2) whether the trial court erred in entering summary judgment in favor of Fred's; and (3) whether the trial court erred in entering summary judgment in favor of the city. For reasons we will more fully set forth herein, we affirm the trial court's dismissal of the complaint as to Granny's, we affirm the entry of summary judgment in favor of the city, and we reverse the entry of summary judgment in favor of Fred's.

## I. LIABILITY OF GRANNY'S OUTSIDE THE LIQUOR CONTROL ACT

Plaintiff's complaint, as to Granny's, alleged that Daymond was a patron of Granny's on September 20, 1990, and while a patron Daymond participated in a promotion called "the chair," wherein

customers paid a fee to be placed in a barber chair, have alcoholic beverages placed in their mouths, and have the chair spun around three times. Successful participants, those who do not throw up, win T-shirts. The complaint alleged that Daymond became intoxicated as a result of his participation in "the chair," that as a result of his intoxication Daymond "caused the motorcycle he was driving to cross over into the westbound lane of traffic and collide head-on with another vehicle," and that Daymond died as a result of injuries received in that collision.

The complaint alleged that Daymond's death was a direct and proximate result of the willful and wanton acts of Granny's in violation of certain provisions of the Liquor Control Act of 1934 (Liquor Control Act) (235 ILCS 5/1—1 *et seq.* (West 1992)). The complaint was brought solely as a wrongful death action against Granny's; there were no counts of the complaint alleging a cause of action against Granny's or any other party under section 6—21 of the Liquor Control Act. (235 ILCS 5/6—21 (West 1992).) The trial court granted Granny's motion to dismiss, which argued that the complaint was insufficient at law to state a cause of action against Granny's because plaintiff's exclusive remedy against Granny's was pursuant to section 6—21 of the Liquor Control Act. 235 ILCS 5/6—21 (West 1992).

Plaintiff claims that Granny's promotion of "the chair" event is a willful and wanton violation of the provision of the Liquor Control Act, section 6—28(b), that prohibits happy hours. (235 ILCS 5/6—28(b) (West 1992).) Plaintiff argues that "the chair" clearly violates at least one provision of section 6—28, and therefore, the Liquor Control Act is not the exclusive remedy. Although we do not answer the question of whether "the chair" violates section 6—28, we assume for the purpose of this opinion only that such is the case. See *Granny's Rocker, Inc. v. State of Illinois Liquor Control Comm'n* (5th Dist. May 16, 1994), No. 5—92—0861 (section 6—28 unconstitutionally vague), *reh'g granted* (July 7, 1994).

Section 6—21 of the Liquor Control Act (formerly section 14 of article VI (Ill. Rev. Stat. 1957, ch. 43, par. 135)) "provides the only remedy against tavern operators and owners of tavern premises for injuries to person, property or means of support by an intoxicated person or in consequence of intoxication." (*Cunningham v. Brown* (1961), 22 Ill. 2d 23, 24, 174 N.E.2d 153, 157.) Since the supreme court's decision in *Cunningham*, numerous decisions have upheld the general rule under various factual scenarios. See *Knierim v. Izzo* (1961), 22 Ill. 2d 73, 174 N.E.2d 157 (holding that an action cannot be maintained against tavern owners and operators under the Wrongful

Death Act for a death caused by an intoxicated person or in consequence of intoxication); *McKeown v. Homoya* (1991), 209 Ill. App. 3d 959, 568 N.E.2d 528 (holding that the Liquor Control Act provides the exclusive remedy for the negligent sale or supply of liquor, if the alleged injury arises in any way from the sale of intoxicating beverages).

■ Plaintiff argues that there has been "some erosion recently of the general rule prohibiting common law causes of action for situations involving the distribution of alcohol." Plaintiff is correct that certain cases have allowed a common law cause of action for situations outside the Liquor Control Act, but plaintiff is incorrect that the general rule is eroding or that this is a situation in which we should recognize an exception to the Liquor Control Act. See *McKeown*, 209 Ill. App. 3d 959, 568 N.E.2d 528.

Plaintiff is correct that certain cases now recognize the common law liability of defendants other than tavern owners or operators; however, all of the cases cited by plaintiff are factually distinguishable from the instant case. (*Haben v. Anderson* (1992), 232 Ill. App. 3d 260, 597 N.E.2d 655 (liability of lacrosse club at university); *Cravens v. Inman* (1991), 223 Ill. App. 3d 1059, 586 N.E.2d 367 (liability of social host under certain, specified conditions); *Quinn v. Sigma Rho Chapter of Beta Theta Pi Fraternity* (1987), 155 Ill. App. 3d 231, 507 N.E.2d 1193 (liability of fraternity).) None of these cases recognize the common law liability of a tavern owner or operator in situations involving the sale of intoxicating beverages.

Plaintiff contends that some degree of common law liability has already been recognized for tavern owners and operators, citing *Harris v. Gower, Inc.* (1987), 153 Ill. App. 3d 1035, 506 N.E.2d 624. Again, *Harris* is factually inapposite to the case at bar. In *Harris*, tavern employees placed an unconscious and intoxicated customer in his vehicle after closing hours on a very cold winter night. This court held that the tavern owner's act, through its agents, of placing an unconscious person outside in a vehicle on such a cold night was the proximate cause of the death, not the serving of alcohol. (*Harris*, 153 Ill. App. 3d 1035, 506 N.E.2d 624.) In the case at bar, plaintiff's complaint did not allege any act of Granny's by which it could be held liable except the act of selling alcohol in violation of the Liquor Control Act.

Plaintiff asserts, however, that Granny's willful and wanton violation of the statute prohibiting happy hours should somehow take the case out of the exclusivity of the Liquor Control Act. The same question has been answered adversely in a similar factual scenario. In *Ruth v. Benvenutti* (1983), 114 Ill. App. 3d 404, 449 N.E.2d

209, the court held that a common law cause of action does not exist against tavern owners or operators for the willful, wanton, and intentional violation of the Liquor Control Act's prohibition against selling alcohol to minors, even though the minor in that case severely injured himself after consuming alcohol at defendant's tavern and even though the tavern owner knew that he was selling alcohol to a minor who was very susceptible to the effects of alcohol. A violation of the happy hour prohibition, such as that alleged by plaintiff's complaint, is not so different from the prohibition against selling alcohol to minors. Therefore, we follow the reasoning and the rule of *Ruth* (114 Ill. App. 3d 404, 449 N.E.2d 209), and hold that no common law cause of action exists against Granny's for a willful and wanton violation of the statutory prohibition against happy hours. Accordingly, we affirm the trial court's dismissal of plaintiff's complaint as to Granny's.

## II. SUMMARY JUDGMENT FOR FRED'S

We now turn to the issue of whether the trial court erred in granting summary judgment to Fred's. Count II of plaintiff's complaint alleged that Daymond "obtained possession" of an impounded motorcycle from Fred's. Plaintiff's theory of recovery against Fred's was negligent entrustment under the Wrongful Death Act. (740 ILCS 180/0.01 (West 1992).) Plaintiff argues that there is a genuine issue of material fact as to whether Fred's should have known that Daymond was intoxicated at the time the motorcycle was released to him. We agree that the evidence before the trial court in ruling on Fred's motion for summary judgment was conflicting as to whether Fred's should have known that Daymond was intoxicated and whether Fred's released the motorcycle to Daymond.

The evidence before the court in support of and in opposition to Fred's motion for summary judgment is as follows. Richard Wooley owned the motorcycle Daymond was driving at the time of his death. Richard loaned the motorcycle to a friend, Patrick West, on September 20, 1990. Richard thought Patrick was going to take the motorcycle straight home. He was not aware that Patrick drove the motorcycle to Granny's that evening, until the next day when he was informed of the accident. Richard would not have loaned the motorcycle to Patrick if he had known Patrick was going to a tavern with it. Richard knew Daymond, as Daymond had been working on the motorcycle for a few days before it was loaned to Patrick, but Richard would not have loaned the motorcycle to Daymond if Daymond had asked, because Richard did not know Daymond very well.

After Richard consented to allow Patrick to borrow the motorcy-

cle, Patrick went to Daymond's house, where Daymond had been working on the motorcycle. Patrick arrived at Daymond's between 6 and 8 p.m., they drank beer till about 10:30 p.m., and then they left to go to Granny's. Patrick drove the motorcycle, and Daymond drove his truck. Patrick did not have a license to drive a motorcycle.

At Granny's, Patrick watched Daymond participate in "the chair." During "the chair," Daymond drank nine shots of 80-proof alcohol. Daymond also drank at least one additional mixed drink and one beer while at Granny's. Immediately after Daymond rode "the chair," he and Patrick went outside to the parking lot to look at Richard's motorcycle. Patrick testified that he and Daymond had drunk a lot together prior to the night of Daymond's death, but Patrick had never known Daymond to show any effect from drinking.

Outside, Tony Leach asked them if he could ride the motorcycle. Patrick testified that they consented. Tony was stopped by the Alton city police shortly after leaving Granny's parking lot. Two officers arrested Tony and brought the motorcycle back to Granny's parking lot. While the police were waiting for Fred's to tow the motorcycle, Daymond tried to gain possession of it by telling the police that he was buying the motorcycle from Richard.

Officer James Velloff testified that Daymond was belligerent and "appeared to be intoxicated" at approximately 11:50 p.m. Officer Velloff stated that he would not have released the motorcycle to Daymond, due to Daymond's state of intoxication, even if Daymond had been the rightful owner. Velloff further testified that a person not trained in recognizing intoxication might not have known that Daymond was intoxicated. Officer Michael Gordon testified that he could not tell whether Daymond was intoxicated at that time.

What we do not know from the record is whether the person who towed the motorcycle, Fred Dublo, Jr., witnessed the conversation between Officer Velloff and Daymond. We also do not know from the record whether Officer Velloff told Fred to take the motorcycle and not to let anyone present at Granny's have it. We may not be able to assume facts not in the record showing that Fred had knowledge that Officer Velloff refused to release the motorcycle to Daymond, but equally, we cannot assume that Fred did not know that Officer Velloff refused to allow Daymond to have the motorcycle.

Fred testified that on September 20, 1990, he was at home when he received a telephone call to come tow a motorcycle away from Granny's. The city had a contract with Fred's whereby Fred's towed all vehicles impounded by the city. After Fred towed the motorcycle to his lot, Patrick and Daymond drove to Fred's in Daymond's truck.

At Fred's, both Patrick and Daymond talked to Fred, trying to

persuade him to release the motorcycle to them. Fred knew the motorcycle belonged to Richard, not Patrick or Daymond. Fred knew who Patrick was but did not know Daymond. Patrick and Daymond gave Fred "a story that they had made a trade with [Richard]" for a car and some cash. After they talked to him for about 10 minutes, Fred hesitantly released the motorcycle. Fred thought it was a "likely situation what they had done." Patrick paid the $40 towing bill. Fred did not pay any attention to which of the two was going to drive the motorcycle away from his shop, but he saw Patrick drive away in the truck. Fred did not request any form of identification from either Patrick or Daymond. Fred "was trying to get the motorcycle unloaded and get [his] equipment put away so [he] could go home." Richard's statement indicated that he would not have cared that Patrick took possession of his motorcycle from Fred's, if Patrick had brought the cycle back undamaged the next day.

The coroner's inquest indicates that at 1:06 a.m. on September 21, 1990, the coroner received a telephone call regarding a traffic fatality. The coroner's investigation revealed that Daymond was driving a motorcycle obtained from Fred's at the time of the accident. The accident occurred a short distance from Fred's on Homer M. Adams Parkway, when the motorcycle crossed the concrete center median and collided head-on with a passenger car travelling in the opposite lane of traffic. Daymond was not wearing a helmet. He died of massive head injuries. The lab report indicated that Daymond's blood-alcohol level was 0.092 grams %. The blood sample was taken at the hospital after intravenous fluids were administered to Daymond, who had a pulse at the accident scene before he was transmitted to the hospital.

Fred's motion for summary judgment alleged that there was no evidence that Fred knew or should have known that Daymond was intoxicated at the time the motorcycle was released, no evidence that Fred owed any duty to refrain from releasing the motorcycle to Daymond, and no evidence that the motorcycle was released to anyone other than the rightful owner or one authorized by the rightful owner. The trial court granted Fred's motion for summary judgment without clarification. The grant of summary judgment as to Fred's was in error.

One of the major problems in deciding whether to sustain the trial court's summary judgment is the dearth of information. This court was only presented with bits and pieces of depositions from a few potential witnesses that leave many questions unanswered.

A motion for summary judgment should be granted only if "the pleadings, depositions, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Johnson v. Ortiz* (1993), 244 Ill. App. 3d 384, 386, 614 N.E.2d 408, 410; 735 ILCS 5/2—1005(c) (West 1992).) When deciding if a triable issue of fact exists, the court must construe the pleadings, depositions, and affidavits most strictly against the moving party and most liberally in favor of the opponent. *Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867; *Johnson*, 244 Ill. App. 3d 384, 614 N.E.2d 408.

Plaintiff's cause of action against Fred's is based upon a theory of negligent entrustment, *i.e.*, that Fred's negligently entrusted the motorcycle to Daymond at a time when he knew or had reason to know that Daymond was incompetent to drive the motorcycle due to his intoxication. Fred's does not argue that the theory of negligent entrustment cannot apply under these facts, and we agree that the theory of negligent entrustment is legitimately applied to the facts of this case. See *Small v. St. Francis Hospital* (1991), 220 Ill. App. 3d 537, 581 N.E.2d 154 (applying negligent entrustment liability to bailee as entrustor); *King v. Petefish* (1989), 185 Ill. App. 3d 630, 541 N.E.2d 847 (wherein negligent entrustment is held applicable to injuries sustained by the entrustee).

Fred's simply argues that the evidence is clear that the motorcycle was not released to Daymond, but only to Patrick, and that even if Fred's did release the motorcycle to Daymond, the facts are undisputed that Fred's had no actual knowledge and no reason to know that Daymond was intoxicated when the motorcycle was released. We disagree that the evidence is that clear.

A person may be liable for negligent entrustment of a vehicle if that person entrusts the vehicle to one whose incompetency, inexperience, or recklessness is known or should have been known by the owner or entrustor of the vehicle and an injury results from that entrustment. (*Johnson*, 244 Ill. App. 3d 384, 614 N.E.2d 408.) The evidence, construed liberally in favor of plaintiff, indicates that Daymond was drinking from as early as 6 p.m. until shortly before his death at around 1 a.m. the next morning. After 10:30 p.m., Daymond drank at least one beer, at least one mixed drink, and at least nine shots of 80-proof alcohol, which was within an hour before arriving at Fred's to try to gain possession of the motorcycle. Immediately before Daymond went to Fred's, Officer Velloff considered Daymond too intoxicated to release the motorcycle to Daymond even if Daymond had been the rightful owner.

■ Fred was aware that neither Patrick nor Daymond held title to the motorcycle but released it to both of them anyway, without making certain that their "story" was accurate. Fred also knew that

he towed the motorcycle from the parking lot of a bar after midnight and that Patrick and Daymond showed up at Fred's lot soon afterwards. Whether Fred witnessed the conversation between Daymond and Officer Velloff or was told about the conversation by the officer, we do not know, but the record is at least clear that Fred knew that the police stopped an unauthorized driver of the motorcycle and that this driver, Tony Leach, had obtained control over the motorcycle from someone in Granny's parking lot. Fred knew or should have known from the fact that Patrick and Daymond immediately appeared at Fred's lot after Fred towed the motorcycle that Patrick and Daymond had been at the bar. Fred testified that he was hesitant to release the motorcycle to Patrick and Daymond. The evidence is disputed as to whether Fred released the motorcycle to Patrick alone. Rather, the evidence seems to indicate that he released it to both Patrick and Daymond, without considering which one of them would be driving it or whether their possession of the motorcycle was authorized by Richard under the circumstances. We believe that, based upon the evidence presented to the trial court, genuine issues of material fact existed as to whether Fred entrusted the motorcycle to Daymond and, if so, whether Fred should have known that Daymond was intoxicated. These issues are sufficient to preclude granting Fred's motion for summary judgment.

### III. SUMMARY JUDGMENT FOR THE CITY

Plaintiff's complaint against the city is based upon an alleged principal-agent relationship between the city and Fred's. The complaint alleges no acts of negligence by the city apart from the alleged agency relationship with Fred's. Prior to filing an answer in the case, the city filed a motion to dismiss the complaint as to it, pursuant to section 2—619 of the Code of Civil Procedure. (735 ILCS 5/2—619 (West 1992).) The city attached an affidavit and other exhibits to the motion to dismiss. The motion and its attachments indicate that Fred's is an independent contractor, that the city has no control over the manner in which Fred's performs its towing duties, that the city does not pay Fred's anything for towing impounded vehicles but the owner of the impounded vehicle is responsible for all towing fees, and that the city is not reimbursed for any funds collected by Fred's as a result of towing any vehicles under its contract with the city. The trial court held that the motion presented questions of fact and continued the motion generally pending discovery.

After the trial court granted summary judgment in favor of Fred's, the city filed a motion for summary judgment, alleging that the city could not be held vicariously liable for something on which

its supposed agent was held not liable, since the only theory of liability as to the city was *respondeat superior*. The trial court granted the city's motion for summary judgment, in view of its earlier grant of summary judgment to the city's alleged agent, Fred's. We affirm the grant of summary judgment as to the city, but on alternative grounds. *Board of Directors of Olde Salem Homeowners' Association v. Secretary of Veterans Affairs* (1992), 226 Ill. App. 3d 281, 589 N.E.2d 761.

■ Even though Fred's is not entitled to summary judgment at this stage of the proceedings, the city cannot be held liable on a theory of *respondeat superior* for the actions of Fred's. Plaintiff presented absolutely no evidence to contradict the city's evidence that it had no control over the actions of Fred's, with the exception that the city had contracted with Fred's to tow impounded vehicles. The case was continued for general discovery after the city's motion to dismiss was determined to present issues of fact. Apparently, the court treated the motion to dismiss as a motion for summary judgment, which was appropriate, since the motion actually requested the court to enter judgment in its favor based upon uncontradicted facts.

We find that all of the pleadings, depositions, and affidavits on file show that there is no genuine issue of material fact as to the city. (735 ILCS 5/2—1005 (West 1992).) Plaintiff does not allege any independent liability of the city, and the evidence is clear that the city cannot be held liable for the independent acts of Fred's. Thus, we affirm the entry of summary judgment in favor of the city.

Affirmed in part; reversed in part and remanded.

WELCH and GOLDENHERSH, JJ., concur.